UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| RYAN FLOREY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:24-CV-1634-B |
| | § | |
| L. SANDERS, and A. FLUCKES, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION & ORDER

Before the Court are Defendant L. Sanders' and A. Fluckes' Motions for Summary Judgment (Docs. 14 and 15). For the following reasons, the Court **GRANTS** both Motions.

### I.

### BACKGROUND

Florey was detained at the Dallas County Jail, awaiting trial for criminal charges unrelated to the present action. One day, under disputed circumstances, two prison officers tackled Florey to the ground. This case considers whether those two officers—Sanders and Fluckes—can be held liable for violating Florey's constitutional rights, or whether they are instead entitled to qualified immunity.

The altercation started with officers' instructions for Florey to sit down. Sanders and Fluckes, along with other members of the Special Response Team ("SRT"), were conducting walkthroughs of housing pods in the Dallas County Jail. Florey was detained in one of those pods. When SRT entered Florey's pod, they ordered everyone to sit down at the housing pod tables that lined one side of the room. At this time, Florey was seated on the floor holding a tablet computer, and Officer

Cross—another SRT member—walked up to Florey and ordered him to sit in a chair with the other detainees. *See* Doc. 16, Br. Mots., 7; Doc. 27, Br. Resp., 10. From this point, the Parties' accounts diverge.

A.   *Florey's Version of Events*

Florey claims, through written declaration, that when asked to be seated he "immediately got up and began to start walking toward the tables." Doc. 28, Resp. App., Decl. Florey, 8. Florey "did not say anything" to the officers, did not attempt to flee, did not position himself in a threatening manner or otherwise threaten any officer (verbally or physically), and did not otherwise resist. *Id.* at 8-9. But despite his compliance, "[t]he officers suddenly came up from behind and slammed [him] on the ground." *Id.* at 8. In doing so, the officers broke his glasses, "busted" his mouth, and gave him head injuries including loss of memory, change in personality, and "likely" a concussion. *Id.* at 8-9. Florey was then handcuffed and taken out of the pod. *Id.* at 8.

Florey also provides a declaration from his mother, Neila Florey, and an affidavit declared under penalty of perjury from Aaron Jones, a fellow inmate who was purportedly present at the time of the incident.[1] *See* Doc. 28, Resp. App., Exs. F & G. While Neila Florey's declaration and Jones' affidavit contradict one another on various points, both allege that Florey was on a tablet computer talking to his mother (or parents) when he was taken to the ground (although all Neila Florey knew at the time was that Florey suddenly dropped the phone and she heard a commotion) *Id.* Jones states that Florey was obeying officers' orders before being taken down, and Neila Florey states that she

---

[1] Florey also submits Jones' "audio statement." At this summary judgment stage, the Court will consider Jones' affidavit, but not the audio statement. "[I]f the testimony that the nonmovant initially offers in opposition to summary judgment is neither sworn nor declared under penalty of perjury to be true and correct, it is not competent evidence." *Smith v. Palafox*, 728 F. App'x 270, 274 (5th Cir. 2018) (citation modified and citations omitted). Jones' affidavit does not mention the audio recording, nor does Florey otherwise attempt to authenticate it. *See* Doc. 28, Resp. App., Ex. F. Thus, the audio recording is not competent evidence.

did not hear Florey say anything to the officers before dropping the phone. *Id.*[2] Jones also adds that he heard officers call Florey a "smart ass" just before, and that while he had never seen officers confront Florey before the incident, he had also seen officers "getting on to" Florey "about something" in the rec yard prior to this incident. Doc. 28, Resp. App., Ex. F.

B.   *Sanders' and Fluckes' Declarations*

Sanders and Fluckes tell a different story. Sanders, also by declaration, claims that Officer Cross told Florey to get off the ground and sit down at a vacant seat located directly in front of him. Doc. 18, Mots. App., Decl. Sanders, 83. Ignoring both Officer Cross and a fellow inmate who tried to direct Florey to that seat, Florey instead walked away from Officer Cross. *Id.* While doing so, Florey said something to the effect of "I'll sit where I want to sit. F*** you bitch" at least twice. *Id.* Only then did Sanders choose to pull Florey to the ground using a "reverse wristlock takedown technique." *Id.* The officers then handcuffed Florey—which he actively resisted while on the ground. *Id.* at 84. Sanders states that in situations involving verbal and physical non-compliance where the officers are outnumbered, SRT's typical approach is to remove the inmate from the situation. *Id.* at 83. This requires the inmate to be restrained, and by acting quickly—as opposed to stopping and asking the detainee to put his hands behind his back—an officer limits the detainee's opportunity to fight or resist. *Id.* at 83-84.

Fluckes' declaration mirrors Sanders' declaration, adding only that when Sanders began taking Florey to the ground, Fluckes assisted by grabbing Florey's left arm and placing him into a "shoulder lock," then an "elevated back arm lock" to gain control of Florey's left arm. Doc. 18, Mots.

---

[2] Jones makes various other conclusory allegations that are plainly inconsistent with video evidence as described below (*e.g.*, Jones claims that officers were trying to rush Florey, so Jones "stepped in"), which this Court will not consider. *See* Doc. 28, Resp. App., Ex. F.

App., Decl. Fluckes, 91. Fluckes suggests he did this to stabilize Florey, thereby preventing Florey from striking any officers, and enabling him to be more readily handcuffed. *See id.*

C.       *Video Evidence*

Video evidence provides additional detail. Footage of the housing pod at the time of the incident shows SRT officers enter the room and gesture for inmates to sit at the tables. Doc. 17, Mots. App., Video 1, 02:01-02:08. Officer Cross is seen approaching Florey and gesturing for him to get off the ground and sit at the table. *Id.* After about eight seconds, Florey gets to his feet. *Id.* at 02:08. However, even once standing, Florey—now the only detainee not seated in a chair—leans back against the wall and turns his attention back to his tablet computer momentarily, as Officer Cross and other officers continue to gesture for him to move to a seat. *Id.* at 02:08-02:14. After a few seconds, Florey starts to move forward from against the wall, and Officer Cross is seen placing a hand on his back and nudging him toward an open seat directly adjacent from where Florey was on the ground. *Id.* at 02:14-02:17. At the same time, a fellow inmate, seated next to the adjacent, open seat is seen tugging on Florey's arm trying to guide him toward that seat. *Id.* Florey ignores both Officer Cross and the inmate, instead moving across the room in the direction of other tables. *Id.* at 02:17-02:22. Five seconds later, as Florey walked by Sanders and Fluckes, the two officers take him to the ground. *Id.* About one minute later, Florey, now in handcuffs, is helped to his feet and escorted out of the pod. *Id.* at 02:22-03:27. The pod cam has no sound and does not reflect whether Florey said anything to any of the officers before being taken down. *See generally id.*

Sanders' bodycam, while not capturing Cross' exchange with Florey, shows Florey walking past the adjacent open seat and toward another table, while looking down at his tablet computer with headphones in his ears. Doc. 17, Mots. App., Video 2, 00:00-00:04. As with the pod cam, it

also shows a fellow inmate trying to help Florey into that same open seat. *Id.* However, the bodycam recording has no sound for the first thirty seconds of footage, and as a result, it does not reflect whether Florey said anything to any officer. *See id.* at 00:00-00:35. Nor does it focus in on Florey enough to determine whether he was speaking immediately prior to Sander's intervention. *See id.* at 00:00-00:05. It does, however, show that Florey was bleeding from his mouth or face immediately after being taken to the ground. *Id.* at 01:04-01:10.

Sanders' bodycam recording also includes various audible statements made by Sanders to other officers during and immediately following the incident. As Florey struggles on the ground, and officers attempt to put him in handcuffs, Sanders can be heard saying "all you had to do was listen, that's it" and "please listen." *Id.* at 00:36-00:50.[3]

Officer Rubalcado, another SRT officer, also had a recording bodycam at the time of the incident. His bodycam similarly failed to capture the events immediately leading up to Sanders' intervention, but as with Sanders' bodycam, it picked up Sanders' statements that all Florey had to do was "listen." *See generally* Doc. 17, Mots. App., Video 3.

D.    *Other Evidence*

A jail incident report states that Florey was the only inmate who did not comply when asked to sit. Doc. 17, Mots. App., 10. It records that when Officer Cross asked Florey to sit, "he became combative and stated, 'Fuck you bitch.'" *Id.* It notes that a "major board hearing" was filed against Florey afterward for violating jail rules by "refusing to obey an order." *Id.*

---

[3] Other audible statements, some made several minutes after the incident, appear to be Sanders' explanation to other officers of what happened and what Florey was saying. However, because the video does not itself show Florey making any statement, such evidence is materially disputed by Florey's version of events. Moreover, because the Court resolves this case on uncontroverted video evidence of physical noncompliance, such evidence of additional verbal noncompliance need not be considered.

Finally, medical records relating to the incident note that Florey was bleeding from his mouth but do not mention Florey's other alleged injuries. Doc. 18-2, Mots. App., 158. The only pain reported by Florey to the infirmary was that his right thumb was hurting him. *See id.* Florey was prescribed mild painkillers and ordered to return the next day for an x-ray. *Id.* Florey subsequently refused to get an x-ray. *Id.* at 188.

*E.     The Present Motion*

Florey brought suit under 42 U.S.C. § 1983, asserting violations of his rights under the 14th Amendment, as a pretrial detainee, to be free from excessive force amounting to punishment. Doc. 1, Compl., ¶¶ 30-31. Defendants, through a joint brief, now move for summary judgment and assert qualified immunity. Doc. 16, Br. Mots., 1. The Court considers the Motions below.

## II.

## LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotations omitted). On a motion for summary judgment, the burden is on the movant to prove that no genuine issue of material fact exists. *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001). To determine whether a genuine issue exists for trial, the court must view all of the evidence in the light most favorable to the non-movant. *See Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 371-72 (5th Cir. 2002).

When qualified immunity has been raised, "[t]he moving party is not required to meet its summary judgment burden for a claim of immunity." *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th

Cir. 2007) (citation omitted). Rather, the movant need only plead his good-faith entitlement to qualified immunity, whereupon "the burden shifts to the plaintiff to rebut it." *Id.* (emphasis and citation omitted).

A district court may not grant summary judgment based on qualified immunity "[i]f resolution of [qualified immunity] . . . turns on what the defendant actually did," and the plaintiff's version of the story would defeat the qualified-immunity defense. *See Haverda v. Hays Cnty.*, 723 F.3d 586, 599 (5th Cir. 2013) (citation omitted). However, when videotape evidence is available, a court is not required to adopt the plaintiff's version of facts if the plaintiff's story "is blatantly contradicted by the [video] record, so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see Griggs v. Brewer*, 841 F.3d 308, 312 (5th Cir. 2016) ("[A]lthough courts view evidence in the light most favorable to the nonmoving party, they give greater weight, even at the summary judgment stage, to the facts evident from video recordings taken at the scene." (citing *Carnaby v. City of Hous.*, 636 F.3d 183, 187 (5th Cir. 2011))).

## III.

## ANALYSIS

The Court **GRANTS** summary judgment in favor of Defendants because there is no genuine dispute of material fact that Sanders and Fluckes are entitled to qualified immunity as a matter of law.

The doctrine of qualified immunity shields government officials acting within their discretionary authority from liability when their conduct does not violate clearly established statutory or constitutional law of which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In reviewing a motion for summary judgment based on qualified immunity, courts

undertake a two-step analysis. "First, we ask whether the facts, taken in the light most favorable to the plaintiffs, show the officer's conduct violated a federal constitutional or statutory right." *Luna v. Mullenix*, 773 F.3d 712, 718 (5th Cir. 2014) (citations omitted), *rev'd on other grounds*, 577 U.S. 7 (2015). "Second, we ask whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (internal quotations omitted) (citation omitted). "Courts have discretion to decide which prong of the qualified immunity analysis to address first." *Morgan v. Swanson*, 659 F.3d 359, 371 (5th Cir. 2011). Here, because the Court's resolution turns principally on its conclusion that the right asserted by Florey was not clearly established, the Court addresses step two first.

A.   *Defendants' actions do not violate clearly established law*

Clearly established law does not place the constitutionality of Sanders' or Fluckes' actions—as represented in the summary judgment evidence construed favorably to Florey—beyond debate. Under the clearly established law prong, the Court considers whether the law "so clearly and unambiguously prohibited his conduct that *every* reasonable official would understand that what he is doing violates the law." *Id.* (internal quotation marks and citation omitted). "To answer that question in the affirmative, [the court] must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Id.* at 371-72 (citation modified) (internal quotations omitted). "Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established." *Id.* at 372. Nor are "generalizations and abstract propositions . . . capable of clearly establishing the law." *Id.*

1. <u>There is No Genuine Dispute, Based on the Video Evidence, that Florey was Physically Noncompliant With the Officers' Instruction to Sit in a Chair</u>

There is a reasonable dispute as to whether Florey was verbally abusive to the officers, or whether he said anything at all. The videos do not show Florey speaking, and the various declarations and affidavits are at odds with one another on this subject. The Court takes those facts in the light most favorable to Florey and assumes for the purposes of this Motion that Florey was not *verbally* abusive or non-compliant. However, even so assuming, the undisputed facts and video evidence as to Florey's *physical* noncompliance are sufficient to resolve this matter.

Undisputed facts and video evidence show that when SRT officers entered Florey's pod, he was the last inmate to respond to their command to sit down. *See* Doc. 17, Mots. App., Video 1, 02:01-02:08; Doc. 17, Mots. App., 10. Several officers, including Officer Cross, asked Florey to get to his feet and sit in a chair. *See* Doc. 17, Mots. App., Video 1, 02:01-02:10. Even when Florey got to his feet, he continued to delay, leaning back against the wall and briefly returning his attention to his tablet computer—even as officers continued to tell him to move, and all other inmates remained seated. *See id.* at 02:08-02:10. Florey ignored both Officer Cross and a fellow inmate's efforts to prompt him to sit in the chair adjacent to where he was then standing. *See id.* at 2:14-02:17. With his attention still fixed on the tablet computer, Florey walked away from them and toward another table. Doc. 17, Mots. App., Video 2, 00:00-00:04. Sanders, observing at least moderate, physical non-compliance from Florey, determined that Florey should be removed from the situation. Doc. 18, Mots. App., Decl. Sanders, 83. Sanders pulled Florey to the ground using a recognized "takedown technique" that would limit Florey's ability to resist while he was being handcuffed. *Id.* Fluckes, also having observed Florey's physical non-compliance, and recognizing that Sanders was going to handcuff Florey, assisted by securing Florey's left arm through other standard law

enforcement techniques. Doc. 18, Mots. App., Decl. Fluckes, 91. Once Florey was handcuffed, officers helped him to his feet and escorted him out of the pod without any further force or aggression. *See* Doc. 17, Mots. App., Video 1, 02:22-03:27.

The Court finds that insofar as Florey's declaration, Neila Florey's declaration, and Jones' affidavit claim that Florey was entirely compliant with officer commands they are "blatantly contradicted" by video evidence. *See Scott*, 550 U.S. at 380. The pod cam video shows that Florey delayed following officer commands and ignored repeat orders to sit down. *See* Doc. 17, Mots. App., Video 1, 02:01-02:17. As such, the Court is not required to adopt Florey's version of events as to physical non-compliance. *See Scott*, 550 U.S. at 380.

Having reviewed available evidence and construed facts in favor of Florey where required, the Court must now consider whether clearly established law prohibited Sanders from using a takedown technique against and handcuffing a detainee who was physically non-compliant but not otherwise verbally or physically threatening. The Court must also consider whether Fluckes, on the same circumstances, violated clearly established law for assisting in restraining Florey as he was being taken down and handcuffed.

2. <u>Neither Sanders nor Fluckes Violated Clearly Established Law When They Used Force Against Florey</u>

Neither the Parties nor this Court have identified clearly established law that puts the constitutionality of Sanders' and Fluckes' uses of force beyond debate.

Courts have long recognized that officers are permitted to use some force against pretrial detainees or inmates to gain or maintain discipline and control without fear of violating the Constitution. *See, e.g., Sanchez v. Griffis*, 569 F. Supp. 3d 496, 510 (W.D. Tex. 2021) ("Officials are justified in using some degree of force in a good-faith effort to maintain or restore discipline where

a prisoner refuses to cooperate with legitimate directives of an official." (internal quotation and citation omitted)), *aff'd*, No. 21-51160, 2023 WL 7984732 (5th Cir. Nov. 17, 2023). In *Sanchez*, the prisoner was "walking briskly away from guards without the required shackles to enter the medical station in defiance of repeated verbal orders." *Id.* at 511. Even absent any finding of a threat, the Court found that some force was authorized "to maintain or restore discipline." *Id.* Similarly, in *Diaz v. Ray*, the court found that at least "some degree of force" was justified where a pretrial detainee alleged that an officer "assaulted [him] causing bodily injuries" after the detainee disobeyed orders to return a tube of ointment which he thought he was permitted to keep in his cell. No. 5:17-CV-025-BQ ECF, 2017 WL 8790964, at *2-3 (N.D. Tex. Nov. 17, 2017) (Bryant, Mag. J.) (noting that disobeying orders "poses a threat to the order and security of the prison as an institution" (citations omitted)); *see also Gonzales v. Rowe*, No. 5:20-CV-052-BQ, 2020 WL 4811005, at *3 (N.D. Tex. July 27, 2020) (Bryant, Mag. J.) (finding some degree of force justified where a prisoner refused to comply with officer's repeated orders to lie down on the cell floor). However, the Fifth Circuit has made clear that where an officer uses force that inflicts injury *after* a subject is "restrained and subdued," such force may be unreasonable and excessive. *Bush v. Strain*, 513 F.3d 492, 502 (5th Cir. 2008).

Florey identifies several cases that he believes clearly establishes that the force at issue here was unconstitutional. Doc. 27, Br. Resp., 5. However, most of the cited case law is merely an application of *Bush*'s principle that injuries inflicted *after* the subject is restrained and subdued may be unreasonable and excessive. *See Hope v. Pelzer*, 536 U.S. 730, 741-42 (2002) (finding constitutional violation where a prisoner who got into a fight on a worksite was subsequently taken back to the prison and handcuffed to a hitching post for seven hours); *Preston v. Hicks*, 721 F. App'x 342, 345 (5th Cir. 2018) (finding that force allegedly used against a prisoner may have exceeded any "good-

faith effort to maintain or restore discipline" because it occurred *after* the detainee was face down on the ground and had stopped resisting) (citation omitted); *Frosch v. Alsobrook*, No. 6:22-CV-00236-JCB-KNM, 2024 WL 4500739, at *12 (E.D. Tex. July 29, 2024) (denying summary judgment because it was unclear whether challenged force occurred *after* detainee was already handcuffed and subdued), *report and recommendation adopted*, No. 6:22-CV-00236, 2024 WL 4299025 (E.D. Tex. Sept. 26, 2024), *aff'd*, No. 24-40662, 2025 WL 1566587 (5th Cir. June 3, 2025); *Williams v. City of Houston, Texas*, No. CV H-16-3342, 2019 WL 2435854, at *10 (S.D. Tex. June 11, 2019) (denying summary judgment because it was unclear whether resistance had ceased before officer's challenged conduct).

Unlike in those cases, Florey was taken to the ground and handcuffed after ignoring Officer Cross' instructions to sit down, as he continued to delay complying by walking away from the directly adjacent seat and toward another table. *See* Doc. 17, Mots. App., Video 1, 02:017-02:22. Moreover, video evidence establishes, and Florey does not claim otherwise, that Sanders and Fluckes ceased using significant force as soon as Florey was handcuffed and stopped resisting. *Id.* at 2:22-03:37. Florey was helped back to his feet and escorted out of the pod. *Id.* Because Florey cannot "point to controlling authority" or a "robust consensus of persuasive authority" that defines the right in question with a "high degree of particularity"—that is, authority pronouncing that the force used by Sanders and Fluckes in response to Florey's physical noncompliance constitutes excessive force in violation of the Fourteenth Amendment—the law cannot be said to be clearly established. *Morgan*, 659 F.3d at 371-72.

B.    *The Court Need Not Determine Whether the Challenged Use of Force was Excessive*

Because the Court finds that there is no clearly established law that could have placed Sanders and Fluckes on notice that they were violating a constitutional right, Florey cannot

overcome his burden to rebut Sanders' and Fluckes' assertions of qualified immunity. *See Hathaway*, 507 F.3d at 319. Thus, the Court will not address whether the force at issue was excessive.

## IV.

## CONCLUSION

For the reasons discussed above, the Court **GRANTS** Sanders and Fluckes' respective Motions for Summary Judgment (Docs. 14 and 15). It is therefore **ORDERED, ADJUDGED**, and **DECREED** that Florey takes nothing from Sanders and Fluckes. This is a **FINAL ORDER AND JUDGMENT** that disposes of all parties and all claims and controversies in the above-captioned case.

SO ORDERED.

SIGNED: October 16, 2025.

_____
JANE J. BOYLE
SENIOR UNITED STATES DISTRICT JUDGE